## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CSI ENTERPRISES, INC., | ) | Case No. 95-11642-SBB |
| ENERGY FUELS, LTD., | ) | Case No. 95-11645-SBB |
| OREN LEE BENTON, | ) | Case No. 95-11648-SBB |
| ENERGY FUELS EXPLORATION COMPANY, | ) | Case No. 95-11649-SBB |
| NUEXCO TRADING CORPORATION, | ) | Case No. 95-11651-SBB |
| ENERGY FUELS MINING JOINT VENTURE, | ) | Case No. 96-19882-SBB |
| | ) | |
| Debtors | ) | (Jointly Administered under |
| | ) | Case No. 95-11642-S BB) |

### TECHSNABEXPORT LTD.'S MOTION FOR ORDER AUTHORIZING AND DIRECTING DISTRIBUTIONS TO CREDITORS OF THE NUEXCO EXCHANGE A.G. ESCROW FUNDS (WITH RESERVE TO NEAG ADMINISTRATOR) PURSUANT TO THE CONFIRMED CHAPTER 11 PLAN

Techsnabexport Ltd. ("Tenex"), a creditor with allowed claims against certain of the above-captioned debtors, as well as a claim against the escrow and assets of Nuexco Exchange A.G. ("NEAG") of $177,000,000.00,[1] files this pleading seeking an order authorizing and directing the distribution to Tenex and other beneficiaries of the Escrow (as that term is defined herein), pursuant to the terms of the Second Amended Plan of Reorganization for the Jointly Administered Debtors confirmed in these cases (the "Plan") and related documents (the "Tenex Motion").  In further support for such relief, Tenex states the following:

### INTRODUCTION

1.  This pleading seeks to resolve an impasse concerning distribution of certain escrowed and future funds, and in turn, achieve consummation of the Plan approved in this Court approximately 10 years ago.

---

[1] This amount does not include interest and fees to which Tenex is entitled to receive.

2. As this Court is aware, Industrial Nucleares de Brasil ("INB") filed a Motion of Party in Interest to Compel Payment Under Confirmed Plan of Reorganization (the "INB Motion"). That Motion is scheduled to begin hearing on November 19, 2007.[2] The INB Motion seeks distribution of all funds Escrowed and future similar funds to the NEAG Administrator (as those capitalized terms are defined below). As addressed in connection with the initial hearing on the INB Motion and below, INB's proposed relief is improper and impractical. It seeks relief that cannot occur under the Plan absent the consent of parties to the settlement agreements incorporated into the Plan, and no settling party has consented.[3] The request also is unfair and impractical because, as the NEAG Administrator has advised the Plan Trustee and Tenex, it may take several additional years to even begin the distribution process in Switzerland under Swiss insolvency law.

3. Nevertheless, Tenex, as the largest creditor of the Debtors, appreciates the desire to transfer monies from the Escrow and move the U.S. Cases (as defined below) toward conclusion. As such, Tenex has assessed how to reach a result in a way that is permitted, practical and fair. Toward that end, Tenex proposes the immediate distribution of the approximately $2.5 million currently held in the Escrow (and future amounts that would otherwise be payable into such Escrow) directly to the intended beneficiaries of those funds *pro rata* in relation to their agreed upon claims under the Plan (the "Direct Distributions") with the balance distributed to the NEAG Administrator (the "Reserved Funds") to cover the maximum projected Swiss governmental fees (U.S.$200,000) and the maximum *pro rata* portion of the one

---

[2] By separate motion, Tenex will seek to have this Tenex Motion heard on that same date.
[3] INB is not a party to any of the settlement agreements incorporated into the Plan. INB did not object to the Plan and now seeks to enforce it. *See* Motion of Party in Interest to Compel Payment Under Confirmed Plan of Reorganization (D.E. 3200).

remaining claim that was not resolved by settlement, that of INB.[4] This proposed relief is not only fair, efficient and authorized under the Plan, all parties (including the NEAG Administrator) either consented, or did not object, to it during the Plan process. Moreover, Tenex has informed the NEAG Administrator of the proposed relief and understands that he considers the relief to be consistent with the terms of the Plan. Therefore, this Court should grant the Tenex Motion and permit direct distributions from the Escrow to occur immediately.

## FACTUAL BACKGROUND

4. On February 23, 1995, CSI Enterprises, Inc., Energy Fuels, Ltd., Oren Lee Benton, Energy Fuels Exploration Company and Nuexco Trading Corporation filed separate chapter 11 petitions in this United States Bankruptcy Court for the District of Colorado (the "Court").

5. On August 26, 1996, Energy Fuels Mining Joint Venture, filed a chapter 11 petition in this Court. Energy Fuels Mining Joint Venture and CSI Enterprises, Inc., Energy Fuels, Ltd., Oren Lee Benton, Energy Fuels Exploration Company and Nuexco Trading Corporation are referred to collectively as the "U.S. Debtors" and the related chapter 11 cases as the "U.S. Cases." The U.S. Debtors, other than Oren Benton himself, are business entities that were wholly owned by Oren Benton.[5]

6. On February 27, 1995, the Court entered an order granting joint administration of the U.S. Cases. (D.E. 9).

7. Tenex filed claims in the bankruptcy cases of Energy Fuels, Ltd., Oren Lee Benton, Energy Fuels Exploration Company and Nuexco Trading Corporation and was a

---

[4] In the event that INB's claim is ultimately subject to reduction or rejection, any balance, after reduction for any necessary Swiss administration fees, will be paid to the other beneficiaries.

[5] Oren Benton is now deceased.

member of the appointed creditors' committee in the above U.S. Cases (the "Creditors' Committee").

8. In 1996, NEAG, another wholly-owned entity of Oren Benton, filed an insolvency petition in Switzerland. NEAG and the U.S. Debtors are collectively referred to as the "Debtors".

9. Mr. Remy Butz is the administrator of the NEAG estate ("NEAG Administrator"). Although similar in some respects to a chapter 7 trustee in the United States, a Swiss administrator does not receive compensation in any part from the estate. Rather, Mr. Butz is a government employee and receives a fixed salary from the government of the Canton of Solothurn in Switzerland.

10. In accordance with Swiss insolvency law, Tenex, INB, and eleven other creditors filed timely claims in the NEAG case on or before November 15, 1996. Since that date no other claims have been filed. Tenex filed a claim in the approximate amount of $242,800,000; INB asserted a claim in the amount of CHF62,530,414.55 (approximately $40 million). A true and accurate copy of the NEAG claim register, signed by the NEAG Administrator, which contains all claims filed against NEAG (other than the UBS Claim as described below) is attached hereto as Exhibit A.

11. After filing claims in the NEAG case, several NEAG creditors agreed to reduce and fix their NEAG claim in conjunction with the settlement agreements approved in conjunction with the Plan. A list of the voluntarily reduced claims is attached as Exhibit A to the NEAG Settlement Agreement (defined below), which is attached hereto as Exhibit B.[6]

---

[6] The NEAG Settlement Agreement is Exhibit 1 to the Tenex Settlement Agreement, both of which were made effective pursuant to the Confirmation Order. *See* Confirmation Order at ¶ 4 (attached as Exhibit C). Specifically, pursuant to Confirmation Order paragraph 4, "[t]he Claims Settlements with the Creditors listed on Exhibit A hereto, or included in the supplement to the Claims Settlement Motion are all hereby approved pursuant to

4

12. On August 18, 1997, the Court granted an Order confirming the Plan in the above-captioned U.S. Cases (the "<u>Confirmation Order</u>") (D.E. 2397). Upon entry of the Confirmation Order, the Plan went into effect and David J. Beckman was appointed as "<u>Plan Trustee</u>" for the U.S. Cases. In addition, a Plan Committee was formed that includes, *inter alia*, Tenex.

13. The Plan and Confirmation Order were the product of significant negotiations by and among the Debtors, the Creditors' Committee, creditors of the U.S. Debtors and NEAG, and the NEAG Administrator. By its terms, the Plan incorporates settlements by and among these parties that had the effect of fixing claims and allocating assets. By way of example, Tenex settled its claims against the U.S. Debtors for allowed claims of $125,000,000 against Oren L. Benton, $149,626,356 against Nuexco Trading Corporation and $37,998,791 against Energy Fuels Exploration Company.

14. The settlements were the product of complex negotiations overseen by the Creditors' Committee, and in large part, Tenex and its then bankruptcy counsel, Allan L. Gropper. The Creditors' Committee undertook oversight of the settlement process when it became apparent that it would be difficult, if not impossible, for the U.S. Debtors to confirm a plan of reorganization in these cases without the larger claims being resolved. *See* Disclosure Statement at ¶ 1. To that end, the Creditors' Committee negotiated with key creditors and, with the Debtors, on February 24, 1997, filed their "First Amended Joint Motion of Creditors' Committee and Debtors for Approval of Claims Settlement Agreements and Agreements with Benton" (the "<u>Claims Motion</u>") seeking approval of such settlement agreements. As stated in the Claims Motion, the Committee "reached settlements with virtually all of the major creditors in

---

Bankruptcy Rule 9019(a) . . . ." Tenex is listed on Exhibit A to the Confirmation Order, thereby making the Tenex Settlement Agreement, and the NEAG Settlement Agreement attached thereto, effective. *See* Confirmation Order (<u>Exhibit C</u>).

5

the Bankruptcy Cases." Claims Motion at ¶ 6. Specifically, the creditors with whom the Creditors' Committee and Debtors entered into settlement agreements represent 22 settlement agreements and hold total allowed unsecured claims in all of the cases totaling approximately $800,000,000, which represents approximately 85% of the estimated allowed unsecured claims which are not subordinated under the Plan.[7] *Id.*

15. One party that chose not to participate in the settlement and Plan negotiations was INB. INB also opted not to join settlement discussions concerning its filed claim against NEAG of CHF62,530,414.55 (approximately $40 million). To this date, INB's claim has not been settled. Moreover, the INB claim may be subject to reduction or disallowance depending upon the outcome of certain litigation involving INB and UBS and its rights in certain uranium material.

16. Notwithstanding INB's non-participation, the Plan was structured to incentivize INB to join the settlement post-confirmation. Among other things, the settlement provided that until such final resolution, funds would remain in escrow, and/or that funds could be distributed to creditors of NEAG. Finally, to incentive all parties in interest to finalize the deal, the Plan provided that the claims of creditors, including NEAG, could be reasserted in full or subject to renewed challenge if the Plan and settlements were not fully consummated.

17. During the Plan confirmation process, the NEAG Administrator received letters from representatives of INB, including Mr. Thomas Salerno, stating INB's opposition to NEAG's execution of the Plan settlement agreements. In these letters, INB told the NEAG

---

[7] The settling creditors includes City of Anaheim, British Nuclear Fuels, China Nuclear Energy Industry Corporation, Consumers Power Corporation, Intertech Corporation; James Lewis, Nebraska Public Power District, Nuclear Electric, Ltd., Palabora Mining Corporation; City of Riverside, Siemens Power Corporation, Southern California Edison, Kernkraftwerk Leibstadt, Kernkraftwerk Gosgendaeniken, Nordostschweizerischekraftwerke, Techsnabexport, Union Bank of Switzerland, Union Electric, Westinghouse Electric Corporation and Washington Public Power System.

6

Administrator, among other things, that if he signed the Plan settlement agreements he would expose certain "bankruptcy authorities" (*i.e.*, the NEAG Administrator) and the NEAG's Administrator's government to claims of damages for millions of dollars or Swiss francs. Copies of this correspondence and translations of them into English is attached as <u>Exhibit D</u>. The bases for these threats, if any, remain unknown.

18. To this date, Mr. Butz has neither rejected nor accepted the NEAG settlement agreement. However, given that NEAG voted in favor of the Plan, NEAG is bound by the Plan and related documents.

19. Given the absence of final settlement, and pursuant to the Plan and Confirmation Order (paragraph 7), approximately $2.5 million in NEAG claim funds have been placed into an escrow account controlled by the Liquidating Trustee in these cases (the "<u>Escrow</u>"), where they have remained. This treatment was required under the Confirmation Order:

> In the event that either the Receiver does not execute the NEAG Receiver Agreement or the NEAG Receiver Agreement is challenged, appealed, or does not become final and effective in accordance with its terms under the laws and procedures of Switzerland, distributions shall be made on the claims of NEAG against the Estates only to an appropriate reserve established by the Liquidating Trustee for the benefit of the NEAG creditors . . . .

Confirmation Order at ¶ 7.

20. Notwithstanding INB's initial resistance, over the past 10 years, various parties, including Tenex and the Plan Trustee, have sought to engage INB in settlement discussions without even marginal success.

21. On February 15, 2007, INB filed the INB Motion. The INB Motion sought to, among other things, compel the transfer of the Escrow funds to the Swiss administrator of the NEAG insolvency estate, thereby disregarding the terms of the confirmed Plan and the NEAG

7

Settlement Agreement (defined below). There is a two-day evidentiary hearing on this matter set for November 19-20, 2007.

22. On August 30, 2007, the Plan Trustee with counsel and the NEAG Administrator conducted a telephonic meeting about various case issues. Also present on the call was counsel for Tenex. During that call, the NEAG Administrator stated it could take several years for him to make a distribution of funds under Swiss law. Mr. Butz stated he did not oppose confirmation of the Plan. Mr. Butz recognized, as one possibility, that the Plan provides for the opportunity of direct distribution to NEAG creditors.

23. Mr. Butz also noted that provided that all claims would be paid *pro rata* or properly reserved in their maximum potential *pro rata* claim amount, and that projected governmental costs would be paid, a direct distribution from the Escrow appears to comply with the terms of the Plan. Mr. Butz estimated that Swiss governmental costs would be more than USD$100,000 (CHF150,000), but should not exceed USD$200,000 (CHF300,000).

## ARGUMENT: OBJECTION AND REQUEST FOR ALTERNATIVE RELIEF

24. By this pleading, Tenex seeks entry of an order authorizing and instructing the direct distribution to Tenex and other beneficiaries of the Escrow pursuant to the terms of the Plan and related documents.

25. As stated previously, INB proposes through the INB Motion an improper solution that seeks to disregard the terms of the Plan and the Confirmation Order and have funds sent to the NEAG Administrator for distribution under Swiss law. Not only does this proposal directly contradict the language and intention of the Plan, it would force the intended beneficiaries to suffer multiple years of further delay in receiving such funds. It is also legally impermissible because such distribution would require the consent of the parties to the settlement agreements, and none of such parties have consented.

26. However, Tenex recognizes the disadvantages of the status quo. Among other things, these cases have been pending for approximately twelve years and the Escrowed funds have yet to be distributed to creditors.

27. To move these cases toward a proper and practical solution, Tenex proposes that the Escrowed funds be transferred to NEAG beneficiaries in the amount of the *pro rata* portion of their claim considering both the maximum *pro rata* portion of the INB Claim and an "above-the line" distribution to the NEAG Administrator of potential Swiss costs.[8] To the extent INB's Claim (or the Swiss costs) are reduced or rejected, any balance will be paid to other Escrow beneficiaries.

28. As demonstrated below, such resolution is authorized by the terms of the confirmed Plan, and is fair to all parties, including INB.

**I. This Court Has Jurisdiction Over The Plan, The Escrow Account, NEAG And INB.**

29. The Court retained jurisdiction over this matter pursuant to paragraph 7 of the Confirmation Order:

> In the event that either the Receiver does not execute the NEAG Receiver Agreement or the NEAG Receiver Agreement is challenged, appealed, or does not become final and effective in accordance with its terms under the laws and procedures of Switzerland, distributions shall be made on the claims of NEAG against the Estates only to an appropriate reserve established by the Liquidating Trustee for the benefit of the NEAG creditors, and the NEAG Trustee and the NEAG creditors shall be authorized, on appropriate notice, to take any and all other and further action reasonably designed to effectuate the terms of the NEAG settlement, as embodied in the Plan, and the Claims Settlements, including to the extent reasonably necessary the action set forth in Section 6.2(f) of the Plan. ***This Court shall reserve jurisdiction with respect thereto.***

Confirmation Order at ¶ 7 (emphasis added). *See also United States Trustee v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.)*, 150 F.3d 1233, 1237 (10th Cir.

---

[8] A schedule detailing the *pro rata* percentages of the NEAG creditors for distribution purposes shall be submitted in these cases prior to the hearing on this matter.

9

1998) ("courts will exercise jurisdiction over post-confirmation disputes if the matter sufficiently affects creditors' recoveries under a plan of reorganization") (quoting *U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 216 B.R. 764, 768-69 (W.D. Pa. 1997)); *Lacy v. Stinky Love, Inc. (In re Lacy)*, 304 B.R. 439, 447 (D. Col. 2004) ("After confirmation, the Bankruptcy Court retains jurisdiction to interpret, enforce, or aid the operation of a plan of reorganization.") (citation omitted).[9]

30. This Tenex Motion, seeking distribution of funds based upon a claim in the above captioned cases, falls under this Court's jurisdiction pursuant to the Plan.

31. Further, this Court has jurisdiction over NEAG since a party submits itself to a bankruptcy court's jurisdiction by filing a claim with that court, and NEAG has filed proofs of claim in these cases. *See Katchen v. Landy*, 382 U.S. 323, 335 (1966) ("By presenting their claims respondents subjected themselves to all the consequences that attach to an appearance.") (citation omitted); *Bayless v. Crabtree*, 930 F.2d 32, at * 2 (10th Cir. 1991) (unpublished) ("[O]nce a party presents a claim to the bankruptcy court, it submits to that court's jurisdiction")

---

[9] The Court also retained jurisdiction under the Plan to hear issues of distributions and claims. Specifically, Article XIV of the Plan provides that: "Subsequent to the Effective Date, the Court shall have or retain jurisdiction for the following purposes:

    (a)    To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, and to establish the amount of any reserve required to be withheld from any distribution under the Plan on account of any disputed, contingent or unliquidated Claim; . . .

    (b)    To adjudicate controversies arising out of the administration of the Estate or the implementation of this Plan; . . .

    (c)    To Make such determinations and enter such orders as may be necessary to effectuate all terms and conditions of the Plan, including distribution of funds from Estates, the payment of Claims, and the transfer of Assets from the Estate; . .

    (d)    To determine such other matters as may be provided for in the Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code.) . . .."

WASHINGTON 1282533 (2K)

(citing *Landy*, 382 U.S. at 335); *The Western Nat'l Bank of Colorado Springs v. Dreger*, 1 B.R. 513, 514 (D. Colo. 1979) ("A creditor who files a claim against the estate of a bankruptcy impliedly consents to the summary jurisdiction of the bankruptcy court to determine not only the validity and amount of the claim but also to determine issues set forth in the trustee's counterclaim that arise out of the same transaction."). This is true even in the instance of a foreign corporation. *See Tucker Plastics, Inc. v. Pay 'N Pak Stores, Inc. (In re PNP Holdings Corp.)*, 99 F.3d 910 (9th Cir. 1996) ("The bankruptcy court and the Bankruptcy Appellate Panel correctly held that Tucker [a foreign corporation] consented to the bankruptcy court's exercise of personal jurisdiction by filing a proof of claim.").

32. This Court also has jurisdiction over the Escrow, regardless of where it is located. Pursuant to 28 U.S.C.A. § 1334(e), this Court has "exclusive jurisdiction – (1) of all property, wherever located, of the debtor as of the commencement of such case, and of property of the estate . . . ." In addition, "property of the estate" is defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever located and by whomever held. 11 U.S.C. § 541(a).

33. Finally, by now appearing and filing the INB Motion, INB has (to the extent it did not before) affirmatively submitted itself to this Court's jurisdiction. *See, e.g., Schulman v. California State Water Resources Control Board (In re Lazar)*, 200 B.R. 358, 381 (Bankr. C.D. Cal. 1996) ("By making a general appearance a party voluntarily submits to the jurisdiction of the court."). In fact, the relief sought by this Motion is, with respect to INB, substantially similar to the relief sought by INB. The difference is that unlike the INB Motion, this Motion seeks relief authorized under the Plan.

11

## II. The Terms Of The Settlements, Plan And Confirmation Order Otherwise Support Tenex's Requested Relief

34. The Motion is authorized by the Plan. A confirmed plan of reorganization is binding and enforceable on all creditors, including NEAG. 11 U.S.C. § 1141(a) ("[T]he provisions of a confirmed plan bind . . . any creditor . . . whether or not the claim . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan."); *Bleu Ice Gea v. Behles-Giddens, P.A. (In re K.D. Co., Inc.)*, 254 B.R. 480, 489 (10th Cir. B.A.P. 2000) (holding that plan of confirmation is binding on creditors under 11 U.S.C. § 1141(a) even if the plan is inconsistent with the Bankruptcy Code).

35. Pursuant to the Confirmation Order, the Plan is binding on all holders of claims in these cases. Confirmation Order at ¶ 14 ("In accordance with Section 1141, the Plan and its provisions shall be binding upon . . . any Holders of a Claim against or Holder of an Interest in any of the Debtors . . . ."). Additionally, the NEAG settlement is binding on all persons affected thereby: "the NEAG Settlement embodied in Article 6.2 of the Plan [is] hereby approved . . . Such Settlements are hereby binding on all persons affected thereby . . . ." Confirmation Order at ¶ 7.

36. Further, the Court has the authority to order the transfer of property in order to consummate the Plan. 11 U.S.C. § 1142(b) ("The court may direct the debtor or any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan . . . ."); *Lacy v. Stinky Love, Inc. (In re Lacy)*, 304 B.R. 439, 447 (D. Col. 2004) ("Courts have broad authority under § 1142(b) to order actions required to ensure compliance with a confirmed plan.") (citations omitted).

12

37. Plan section 6.2 resolves and fixes the claims of NEAG against the Debtors. Specifically, pursuant to this section of the Plan, NEAG will have an allowed claim only against Nuexco Trading Corporation ("NTC"), and not against any of the other Debtors, in the total amount of $320,000,000.[10]

38. Pursuant to Plan section 6.2(f), even in the event that NEAG or another party in interest objects to the settlement set forth under Plan section 6, the Plan Trust[11] has the right to take action to effectuate the settlement, including to seek a ***direct distribution to creditors of NEAG*** of the amounts provided for in the Plan as a distribution on the NEAG Claim:

> ***In the event that NEAG or another party in interest shall object to the settlement set forth in this Section, and such objection is not overruled in a timely fashion, Proponent reserves the right to take action to effectuate the settlement in accordance with applicable law.*** Such action may include the filing of a United States bankruptcy proceeding for NEAG, in which the foregoing distribution would be effectuated; the ***direct distribution to Creditors of NEAG of the amounts provided for herein as a distribution on the NEAG Claim;*** the commencement of a Claims estimation proceeding or other litigation involving NEAG; or other appropriate relief that will not unduly delay distributions to Creditors. ***The Debtors' rights and the rights of the Liquidating Trustee to object to the Claims of NEAG are preserved until there is a final settlement binding on all parties.*** Notwithstanding the foregoing, Proponent will use its reasonable efforts to avoid unnecessary litigation with NEAG and to effectuate the settlement, if feasible, through an accord with NEAG or its duly constituted representatives.

Plan at § 6.2(f) (emphasis added).

39. Additionally, the Confirmation Order explicitly approves the NEAG settlement referenced in the Plan as binding on all persons affected thereby:

> The Benton/NTC Settlement embodied in Article 6.1 of the Plan and the NEAG Settlement embodied in Article 6.2 of the Plan are hereby approved pursuant to Bankruptcy Rule 9019(a) as just, equitable, reasonable, and non-discriminatory compromises of the claims and controversies resolved by such Settlements and

---

[10] NEAG shall be allowed a Class 4 Claim (as defined in the Plan) against NTC in the amount of $100 million, with the remainder of its claim treated as an Allowed Class 6 Claim (as defined in the Plan) in the amount of $220 million. *See* Plan at § 6.2.

[11] The Creditors' Committee was disbanded and replaced by the Liquidating Trustee and an Oversight Committee. Tenex has been a member of the Creditors' Committee and is a member of the Oversight Committee.

13

> are of substantial benefit to Creditors and other parties in interest in these cases. ***Such settlements are hereby binding on all persons affected thereby*** and all contested matters, adversary proceedings and other actions relating in any way to the Claims resolved in such Settlements are hereby dismissed with prejudice and permanently enjoined. The parties thereto are authorized to transfer any property, execute all documents, and make all payments contemplated by the Settlement.

Confirmation Order at ¶ 7 (emphasis added).

40. Here, through the INB Motion, INB objected to the settlement set forth in the Plan. Specifically, INB seeks to disregard the terms set forth in the Plan and the NEAG Settlement Agreement (effectuated through the confirmation of the Plan) and compel the transfer of the NEAG funds held in escrow to the Swiss administrator of the NEAG insolvency estate.

41. As previously stated, the relief sought by the INB Motion could produce an unfair and unfavorable result for all parties since the NEAG Administrator has advised parties that under Swiss insolvency law that the distribution process could take years. The major creditors in these cases, who have all consented to such settlement (excepting only INB), and who have already waited approximately twelve years for a distribution of funds, would have to endure a further and unnecessary burden and delay simply because, unlike any other creditor, INB has refused to resolve its claims over this many years. Further, INB's request is impractical as it requires the consent of the parties to the settlement agreements, and none of such parties have consented. Since the INB Motion constitutes further objection to the NEAG settlement and seeks an unjust and unfavorable result to all related parties, it therefore properly triggers Tenex's right to seek a direct distribution for itself and other intended beneficiaries (to the extent INB would contend such rights did not exist before its belated appearance in this case, which they did).

42. A direct distribution of the Escrow funds is also warranted pursuant to Plan section 6.3. Plan section 6.3 incorporates and includes various settlement agreements between

the Debtors and certain of their larger creditors. Pursuant to this section, confirmation of the Plan constitutes an order granting each of such settlement agreements:

> ***Claims Settlements***. Proponent has entered into settlements with certain significant Creditors in this Case (the "Claims Settlements"), which Creditors are listed in Exhibit B. The Claims Settlements settle all aspects of the Claims of such Creditor in these Cases, including the allowed amount of such Claims in each Case, the extent of liens on Assets, potential Avoidance Actions against such Creditor, and all other matters related to the relationships and dealings between the Estates and the respective Creditor, except as otherwise provided in the agreements documenting a particular Claims Settlement. A separate motion has been filed by Proponent and the Debtors seeking approval of each of these Claims Settlements with the actual settlement agreements, or if such settlement has not been fully documented an agreed term sheet, attached thereto (the "Claims Settlement Motion"). In addition, the Claims Settlement Motion seeks approval of the Benton Agreement between the Creditors' Committee and Benton and the Benton Family. ***If not previously approved by Order of the Court, the Confirmation Order constitutes an order granting the Claims Settlement Motion and approving each Claims Settlement and the Benton Agreement.*** Approval of a Claim Settlement on behalf of a Creditor under this Section, or a vote in favor of this Plan by any Creditor, shall constitute the further agreement of such Creditor to not challenge any aspect of any other approved Claim Settlement, either in these Cases, or in the NEAG insolvency proceeding.

Plan at § 6.3 (emphasis added).

43. One of the settlement agreements incorporated by Plan section 6.3 and specifically referenced in Exhibit B to the Plan, is a settlement agreement among the Debtors, the Creditors' Committee and Tenex (the "Tenex Settlement Agreement", attached as Exhibit E). Attached as Exhibit 1 to the Tenex Settlement Agreement, and incorporated as a condition therein, is a settlement agreement among the Debtors, the Creditors' Committee and NEAG (the "NEAG Settlement Agreement"). The NEAG Settlement Agreement sets forth amounts owed to NEAG's various creditors, and states that no other claims against NEAG will be recognized except those listed therein.

15

44. Section 5(e) of the NEAG Settlement Agreement explicitly entitles creditors of NEAG to seek a direct distribution from the NTC Liquidating Trustee of their percentage interest in NEAG's claim against NTC:

> It is further acknowledged that a distribution to unsecured creditors from the NTC Estate may not take place for a considerable amount of time. In order to facilitate the resolution of the NEAG Estate, the Receiver may distribute to creditors of NEAG percentage interests in the claim of NEAG against NTC entitling such creditors to seek a direct distribution from the NTC Liquidating Trustee of such percentage interest. Such distribution shall constitute a final disposition of any distribution of such creditors' claims against NEAG.

45. A condition precedent to the effectiveness of the Tenex Settlement Agreement is that the NEAG Settlement Agreement (which is attached as an exhibit to the Tenex Settlement Agreement) be made effective. *See* Tenex Settlement Agreement at ¶ 7(a)(vi). Each of the largest creditors of NEAG consented to the terms of the NEAG Settlement Agreement, except for INB, which threatened the NEAG Administrator out of signing the agreement, and thus the NEAG Settlement Agreement was never formally executed.

46. However, the Plan was confirmed in August, 1997. INB had the opportunity to appear and object to the Plan, the Tenex Settlement Agreement and the NEAG Settlement Agreement, but instead chose to avoid this case altogether. Therefore, pursuant to Plan section 6.3, the Tenex Settlement Agreement and the NEAG Settlement Agreement, which are incorporated into and an integral part of the Plan, are approved and effective. This is also enforceable as to INB because INB has now submitted itself to the jurisdiction of this Court to enforce the Plan.

47. Thus, Tenex and the other creditors are entitled to the direct distribution sought in this motion pursuant to the terms of the Plan and the NEAG Settlement Agreement.

WHEREFORE, Tenex hereby requests this Court enter an order approving a direct distribution to Tenex and other beneficiaries of the Escrow, consisting of their *pro rata* share of funds from the Escrow pursuant to the terms of the Plan and the Settlement Agreements incorporated therein, and that the reserve be distributed to the NEAG Administrator, consisting of U.S.$200,000 for Swiss governmental costs and the maximum *pro rata* amount of INB's claim (based on an asserted claim of CHF62,530,414.55 (approximately $40 million)). A schedule detailing the *pro rata* percentages of the NEAG creditors for distribution purposes shall be submitted prior to the hearing on this matter.

Dated: October 5, 2007                     Respectfully submitted,

**WHITE & CASE** LLP

By:      /s/Francis A. Vasquez, Jr.
Francis A. Vasquez, Jr.[12]
701 Thirteenth St., N.W.
Washington, D.C. 20005
tel.: (202) 626-3600
fax: (202) 639-9355

*Counsel to Techsnabexport Ltd.*

---

[12] Francis A. Vasquez, Jr. was admitted *pro hac vice* in these cases pursuant to an Order of this Court, entered on August 3, 1995 (D.E. 562), and was subsequently admitted to the District Court for the District of Colorado on May 24, 2002.